**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAMES CONNOR, Derivatively on Behalf of ALIGHT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID D. GUILMETTE, JEREMY J. HEATON, RUSSELL P. FRADIN, WILLIAM P. FOLEY, II, MIKE HAYES, ROBERT LOPES, JR., SIOBHAN NOLAN MANGINI, RICHARD MASSEY, KAUSIK RAJGOPAL, CORETHA RUSHING, ROBERT SCHRIESCHEIM, ROHIT VERMA, and DENISE WILLIAMS,<br><br>Defendants,<br><br>and,<br><br>ALIGHT INC.<br><br>Nominal Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff James Connor ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf Alight Inc. ("Alight" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in

numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant Alight*** is a Delaware corporation with its principal executive offices located at 320 South Canal Street, 50th Floor, Suite 5000, Chicago, IL 60606. At all relevant times, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "ALIT."

### Director Defendants

8. ***Defendant David D. Guilmette*** ("Guilmette") was, at all relevant times, the Chief Executive Officer and Vice Chair of the Board of Directors of Alight until his departure from the company on December 31, 2025.

9. ***Defendant Russell P. Fradin*** ("Fradin") is, and was at relevant times, a director of the Company.

10. ***Defendant William P. Foley, II*** ("Foley") is, and was at relevant times, a director of the Company.

11. ***Defendant Mike Hayes*** ("Hayes") is, and was at relevant times, a director of the Company.

12. ***Defendant Robert Lopes, Jr.*** ("Lopes") is, and was at relevant times, a director of the Company.

13. ***Defendant Siobhan Nolan Mangini*** ("Mangini") is, and was at relevant times, a director of the Company.

14. ***Defendant Richard Massey*** ("Massey") is, and was at relevant times, a director of the Company.

15. ***Defendant Kausik Rajgopal*** ("Rajgopal") is, and was at relevant times, a director of the Company.

16. ***Defendant Coretha Rushing*** ("Rushing") is, and was at relevant times, a director of the Company.

17. ***Defendant Robert Schriesheim*** ("Schriesheim") is, and was at relevant times, a director of the Company.

18. ***Defendant Rohit Verma*** ("Verma") is, and was at relevant times, a director of the Company.

19. ***Defendant Denise Williams*** ("Williams") is, and was at relevant times, a director of the Company.

20. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

21. ***Defendant Jeremy J. Heaton*** ("Heaton") was, at all relevant times, the Chief Financial Officer of Alight until his departure from the Company on January 9, 2026.

22. Defendants Heaton along with Defendant Guilmette are collectively referred to herein as the "Officer Defendants."

23. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24. Alight is predominantly an employee benefits solutions company which provides technology-enabled services to employees through the Alight Worklife cloud engagement platform.

25. Alight's platform provides integrated benefits administration, healthcare navigation, financial wellbeing, absence management, and retiree healthcare to its customers while providing actionable insights to employers through data, analytics, and AI.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

26. On November 12, 2024, the company reported third quarter fiscal 2024 results. During the associated earnings call, Defendant Guilmette highlighted his resume and early progress with Alight, in pertinent part, as follows:

> Let me begin by saying how honored I am to guide Alight as it enters its next chapter as a simplified and focused employee benefits and well-being services company enabled by market-leading technology. I spent the past 40-plus years in this industry, supporting large employer health care and employee benefit programs at Aon, Cigna and Willis Towers Watson. And most recently as CEO of Aon's Global Health Solutions business. My past experience informs my familiarity with Alight, the market we serve and the exciting opportunity ahead. This is what compelled me to want to lead this great company.

> In my first 60 days as CEO, I have spent most of my time in the market on a listening tour that has been a complete absorption of what our colleagues, clients and their advisers and the investor community are saying about Alight and better understanding what they need from us. Consistently, I am hearing that we have a great opportunity to entrench our position as the leader in the market. That's what clients and the advisory community expect from us.
>
> ***
>
> I am focused every day on our markets, deepening our relationships with clients, brokers and third-party evaluators, and finally, on our execution. We are firmly committed to our strategy to drive profitable growth and stronger cash flow. The completion of our cloud migration and the sale of payroll and professional services has created an opportunity for Alight to have a leaner and simpler operating model. A key focus for me is the process redesign initiatives that are underway to bring more efficiency across the company while delivering an even better client experience, leveraging technology and how our teams operate.
>
> ***
>
> I've also seen examples of clients who have left Alight return to us. Why? Because we are the best in the industry at all facets of this business, from digital through managing benefits complexity. The commercial momentum is driven by a number of factors. Better field coverage is driving a deeper pipeline, larger deal sizes and improving win rates. The pipeline itself is up over 60% and win rates are up double digits. The focus on ARR is driving a greater mix of long-term contracts being signed.

27. Pertinently, Defendant Guilmette further announced the debut of a dividend for Alight's shareholders, stating:

> With confidence in our return to growth alongside strong cash flow and a healthy balance sheet, I'm pleased to announce that we are initiating a dividend program commencing with a quarterly dividend of $0.04 per share beginning in the fourth quarter. This reflects our commitment and shareholder feedback to consistently return capital via dividends and share repurchases over the long term.

28. Defendant Heaton reiterated the dividend announcement, stating, in pertinent part:

> Year-to-date, we have returned $155 million to shareholders via share buybacks and have $93 million remaining of share buyback authorization. Today, we are also announcing the initiation of a quarterly dividend of $0.04 that will begin in the fourth quarter, which signifies our commitment to a consistent return of capital aligned with our lower leverage and recurring cash flow profile of the business.

29. Defendant Heaton further provided some topline expectations for fiscal 2025, highlighting management's confidence in Alight's future prospects, while falling shy of explicit guidance, stating, in pertinent part:

> Though we are not specific guidance for 2025 at this time, we feel good about the trends we are seeing and expect stronger financial performance across our key metrics. We believe the changes made and those underway support our profitable growth over the long term. We look forward to providing you with a more detailed update at our upcoming Investor Day.

30. During the question-and-answer segment that followed, Defendants touted their decision to issue a dividend as emblematic of their "expectation" and "commitment" to consistency, during the following pertinent exchange:

> **Needham & Company Analyst:** Great. Nice results. Wanted to start off on capital allocation. Obviously, the dividend announcement is new and good to see. How does this change, if at all, your thoughts on potential buybacks, I know that was something post divestiture, you guys have been pretty active on. So how should we think about the balance between dividends and buybacks moving forward?
>
> **Defendant Guilmette:** Kyle, it's Dave. I'll start, and thank you for the question. So look, our position with respect to capital allocation hasn't changed, right? Our commitment is to return the capital to our shareholders through a combination of both the new dividend that we've announced today and the share buyback. And so we've got now the capacity to be able to drive both of those. The dividend is a further commitment and we think an expectation for a consistent approach to delivering that capital to our shareholders. So it's really -- based on our confidence in our free cash flow profile and the forward expectations for the business, we feel really good about returning that capital in a variety of ways.
>
> Jeremy, what would you add?
>
> **Defendant Heaton:** I think that's right. We still got the $93 million of capacity, Kyle, which is important. But I think to Dave's point, the commitment here, and this was the, I think, the strongest way from our perspective to really commit to that consistency for us moving forward.

31. Defendants also briefly discussed their expectations for growth in 2025. In pertinent part, Defendant Guilmette notably indicated margins would continue to improve irrespective of

the Company's growth, failing to account for the need for increased compensation expenses down the line that may impact Alight's bottom line:

> **JPMorgan & Chase Analyst:** Understood. That's good. Just my follow-up then, just Dave or Jeremy. Just thinking about '25, I know you're not going to give specifics, but just thinking of the path to return to the 4% to 6% midterm growth, I know you've given us that walk where you go into volume and then, of course, wins expansions, products, pricing, retention, that kind of thing. What elements still have more work to do in order to get to that 4% to 6% as we're evaluating the business as it builds and progresses through the year next year.
>
> **Defendant Guilmette:** Sure. Tien-Tsin, it's Dave. I'll start and then Jeremy can add on. So we feel really strongly about 2025 being a better year, right? We've got COBRA behind us as an example. We continue to monitor our bookings and the bookings mix through the rest of the year. We're working through the renewal process. We feel very good. We're on solid footing with a number of our large enterprise clients now. We still have some work to do to close that out in the fourth quarter. And I would remind you that our margins are expected to improve irrespective of the growth profile as we continue to streamline the company. So I feel like a lot of the pieces are in place to start moving us in the positive direction as we've indicated previously. Jeremy?
>
> **Defendant Heaton:** Maybe the only thing I'd add, Tien-Tsin, is just the time that will allow us between now and putting out guidance for the year, it gives us a little bit more time in terms of what we're seeing in the environment, the cost consciousness of any of our clients. Post election, the project revenue can be driven by regulatory changes and expectations around that. So it really allows us with that time to get a better view on what we see in that path going forward. But to Dave's point, we feel really good about the trends we're seeing so far.

32. Defendants further highlighted the allegedly strong position Alight was in headed into fiscal 2025, asserting strength in both the Company's pipeline and its sales team's execution capacity, during the following pertinent exchange:

> **Canaccord Genuity Corp. Analyst:** Great. And on the go-to-market front, it's good to see the momentum there. You mentioned the new messaging approach. Do you feel that your go-to-market operation is operating at or close to its optimal level now? Any other changes we could be seeing on this front going forward?
>
> **Defendant Guilmette:** Yes. Pallav, thanks for the question. It's Dave and Jeremy can certainly add into this. We've looked pretty hard at this, and we feel good about the repositioning of the commercial team. We've got enterprise sellers who are augmented with domain experts, people who really understand the benefit space.

And that combination really puts us in a good position, right, to expand existing relationships, retain the ones that we have and to take market share. We have invested in that commercial capability over the last year or so, and we're starting to see that team mature. And so with that additional capacity and that expertise as we head into 2025, we feel like we've got the pieces we need to be able to be successful in growing our market share.

**Defendant Heaton:** And the only thing I might add is just -- and we're seeing it with -- and Dave talked about the better coverage we're getting. I think having our teams in the current structure we are getting deeper with new clients and building new pipeline outside of maybe our traditional pathways we had in prior years. And so we're starting to see the benefits of that, which is why the pipeline is up 60%.

And as Dave mentioned earlier, the sales cycles can be long in a large enterprise benefits administration deal. And so what we would expect to see is, one, the maturity of the team, but as well as the maturity of the pipeline as it builds from early stages and continues to build. So that's part of the expectation for us and the growth profile.

33. On February 20, 2025, Defendants presented their fourth quarter and full year fiscal 2024 results. Pertinently, in the release, Defendants also outlined guidance for fiscal 2025, the first full year under Defendant Guilmette's leadership, as follows:

**The Company's 2025 outlook includes:**

• Revenue of $2,318 million to $2,388 million.
• Adjusted EBITDA of $620 million to $645 million.
• Adjusted diluted EPS of $0.58 to $0.64.
• Free cash flow of $250 million to $285 million.

34. Defendant Guilmette was quoted on the release, speaking to 2024's results and the Company's position entering 2025, in pertinent part:

Alight concluded a transformative year on a strong note, with fourth quarter results that met expectations and included recurring revenue expansion and strong cash flow . . . We enter 2025 as a market-leading, technology-enabled services provider with a simplified foundation and an enviable client roster. With our multi-year technology modernization now complete and a strong leadership team in place, we expect 2025 will be a transitional year focused on execution and steady progress across the key financial measures that drive profitable growth and attractive cash flow.

***

> 2025 revenue is impacted by the lagging effect of contract losses from 2023 and early 2024 . . . Absent these historical losses, our revenue growth rate would be over two points higher in 2025. Our operating trends today are vastly improved with full-year 2024 retention rates up 8 points compared to the prior year and that will play through favorably for revenue later this year and into next year. Coupled with strong bookings growth and visibility into contracted go-lives, we expect to see revenue growth in the second half and moving forward. We plan to share more detail of our long-range plan during our investor day, scheduled for March 20th, 2025.

35. The results further highlighted that Alight "Declared and paid a $0.04 per share dividend" which marks the first such payment under the newly "[i]nitiated dividend program."

36. An earnings call was held later that same morning, during which Defendant Guilmette confidently reiterated the company's expectations for 2025 pertinently as follows:

> With a significant transformation of 2024 behind us, 2025 will be a transitional year, marked by steady progress in execution as we continue to position Alight for profitable, market-leading and sustainable growth.
>
> ***
>
> The health of our business and cash flow profile enabled us to initiate a dividend and today, we announced a $200 million increase to our share repurchase authorization.
>
> Turning to our expectations for 2025: first, we are committed to both simplifying the business and providing more transparency into the key metrics we measure ourselves against. You will hear us focus on recurring revenue and the growth levers, including ARR bookings, and our retention of existing clients; adjusted EBITDA margin, including positive impacts from the cloud migration and productivity initiatives; and now free cash flow, which covers all aspects of our improving cost and investment profile. Moving forward, BPaaS will not be one of those key metrics.
>
> Our 2025 outlook reflects an important step in the right direction with year-over-year improvement across key financial metrics. We expect recurring revenue to be on stronger footing, profit margin to expand independent of top line performance, and free cash flow to accelerate. This is a long-cycle business, and our outlook also includes a lag effect on revenue from historical losses in 2023.

37. Defendant Heaton provided more detailed financial targets and highlighted the Company's dividend for the quarter, in pertinent part:

> [T]oday, we announced a $200 million increase to our existing program. We now have $281 million of share buyback authorization, and we declared our second quarterly cash dividend of $0.04. Together, the balance of capital return and a stronger balance sheet reflects the focus on driving shareholder value.
>
> ***
>
> Given the first half dynamics of this year driven by historical losses and a cautious view on projects, I will be more specific on our seasonality and the ramp through 2025. For the first quarter, we expect total revenue to be down 3% to 4%, with recurring revenue down 1.5% to 2.5%. For the second quarter, we expect total revenue to be down 1.5% to 3%, including recurring revenue of negative 1% to positive 0.5%. For the second half, we expect a return to low single-digit to mid-single-digit growth, driven by new ARR deal go-lives and the early benefits of a stronger 2024 renewal cycle.
>
> As Dave mentioned earlier, we have not seen an improvement in client demand for nonrecurring projects. Our outlook for the year is based on the specific pipeline we see today with these clients and expect first half revenue to decline roughly 25% in each quarter with mid-single-digit growth in the second half off of last year's lows.
>
> For the year, our revenue growth rate contemplates 5% to 7% of incremental revenue from new wins with current clients and new logos, 0 to 1% from participant volumes, and losses of over 6%. Without the historical loss impact, our growth would be more than 2 points higher this year. We share a modest view on participant counts and do not expect a material uplift this year. While we continue to monitor policy changes, the business impact related to tariffs and the Department of Government Efficiency are expected to be immaterial based on the nature of our public sector work.
>
> We expect full year adjusted EBITDA of $620 million to $645 million with margin expansion between 150 and 180 basis points. We are confident in the margin expansion independent of the top line given the operational improvements we've made. We will benefit from $55 million of cloud migration savings, the elimination of transaction dis-synergies, and from productivity initiatives underway on the path toward 28% plus adjusted EBITDA margins. We expect full year adjusted EPS of $0.58 to $0.64, which does not include any impact from potential share buybacks.
>
> We are introducing our free cash flow outlook of $250 million to $285 million or growth of 13% to 29%. Free cash flow will benefit from stronger profitability as well as reduced capital expenditures. Finally, we expect annual ARR bookings of

> $130 million to $145 million, continuing a growth trajectory as we benefit from a strong pipeline and the ARR focus on employee benefits.

38. During the question-and-answer segment of the call, Defendants discussed the implied second half ramp in Alight's 2025 outlook, pertinently addressing project growth expectations:

> **Keybanc Capital Markets Analyst:** Most of my questions have been answered, but I wanted to drill or ask, I just wanted to drill in on the back half revenue growth assumptions for this year, low to mid-single digits. What's being implied on the bottom end of the range and what's being implied on the top end of that range for the back half of the year, Jeremy, I appreciate you giving up this revenue from new wins range and volumes, PEPM range. But maybe kind of drill in what would be implied to get to the low single digits and what would be implied to get to the high single digits.
>
> **Defendant Heaton:** Sure. So I think, Scott, on the -- what we'll watch this year is one, we understand contractually already what's in line from the bookings in 2024. So that's contractual and again, is within the guide. There's also what we'll execute in 2025, and so we -- coming into a year, we've got 89% revenue under contract. That other 11% comes from ARR wins in year that drive and have go-lives. So I think not your larger benefits administration, but mid-market deals or navigation or lease deals that go live within a year.
>
> So you start to drive revenue. So it's really the timing and the mix of those ARR bookings in 2025 is a driver that creates a difference between what the high end and the low end would look like, and then the other piece of it is project revenue. Again, you can -- we talked about the cautiousness we've got in looking at the project revenue within the business.
>
> We will continue to watch that. Our teams are working very closely day-to-day on site with our clients and building that pipeline. What you typically expect to see is less volatility on project in the second half of the year, because those projects are driven around the enrollment process, whereas in the first half of the year tend to be more one-off projects related to regulatory changes or M&A work. And so start to get more of a solidified view of that pipeline as we get into the second half around project revenue, but certainly can create some variance between where that ends up being and coming through in the second half revenue.
>
> And then the last piece I would say is just on participant counts. Again, 0 to 1% is the view. We've seen historic -- that's pretty on the low end of what we've seen historically on participant accounts, and that can also be a driver. So those are -- that's what I tell you are the kind of bigger factors for the back half.

> **Defendant Guilmette:** And Scott, maybe -- it's Dave. Just I'll add a little color to it. So if we think about the mix of what we take to the marketplace, our products and solutions it can range from small things that maybe our one-off projects, say on communication support, which we would see in the early part of the year, to things that perhaps are going to be annual recurring revenue that could actually take effect sometime in the year.
>
> So if we win a leaves piece of business, for example, and we learned about that in the first quarter, we could be implementing that sometime in the second half of the year. But when you get to the large things like a health administration contract that's multiyear, if we win that in the beginning of the year, we're probably not going to see revenue flow from that until sometime in 2026.
>
> And then the project work back to what Jeremy said is going to be driven off of plan design changes, vendor reconfiguration, things of that nature that our clients are thinking through right now. And so if they do make those significant changes that could lead to meaningful project work for us, but that would tee up some time in the third, fourth quarter.

39. Defendant Heaton further spoke to the Company's recent dividend, falling well short of suggesting any indication to quickly halt the new program, in pertinent part, during the following exchange:

> **Needham & Company Analyst:** . . . Maybe just a follow-up on capital allocation, how you guys are thinking about it, good to see. Obviously, you guys now have the dividend here for a couple of quarters. You kind of upped the buyback. Assuming you've provided more at the Analyst Day, but any thoughts on how you guys are kind of thinking about the balance between the 2, especially with the stock at current levels, I think, could be really helpful for everybody on the call.
>
> **Defendant Heaton:** Sure. Kyle, I'll take that one. Certainly, we're pleased with the dividend and just paying the second dividend or approving the dividend with the Board last week. I think that obviously comes first, but we're going to be very opportunistic in terms of where we view the value of the company, and that was an important discussion we had in the reasoning behind the $200 million increase in the authorization.
>
> So I do expect us to be opportunistic there and continue to leverage the authorization that we have in place.

40. On March 20, 2025, Defendants conducted their Analyst/Investor Day conference. Contemporaneous with the presentation, Defendants issued a press release highlighting "MidTerm Targets," in pertinent part, as follows:

> Mid-Term Financial Outlook
>
> • Total annual revenue growth rate of 4-6% by 2027
> • Adjusted EBITDA margin of approximately 30% by 2027
> • Cumulative free cash flow of approximately $1 billion between 2025 and 2027

41. During the presentation, Defendant Guilmette outlined his confidence in Alight's current position and its capability to capitalize on future prospects, in pertinent part, as follows:

> Our current assets and our current capabilities position us for commercial success. One of the first things I did when I came on as CEO was take a hard look at what do our solutions look like, what do we have, how are we going to market. We don't really need anything more than what we have. Yes, we'll fine-tune and maybe some opportunities to maybe tuck some things in here or there. But the core aspects of what we have in Alight today as a services company, delivering employee benefits is best in class, and it's an opportunity for us to grow and have real commercial success.
>
> And finally, we have a very compelling view and line of sight to creating significant shareholder value. And you'll see Jeremy walk you through the details around what those financials look like. But suffice to say, we're in a great position as we take this business forward to create great shareholder value.
>
> ***
>
> Our growth strategy and execution will deliver high-quality revenue growth, margin expansion and free cash flow. We have a clear line of sight to mid-single-digit revenue growth. We have a defined path to 28% margin in 2026 and even more in 2027. We have double-digit free cash flow growth. We have a cumulative free cash flow number of $1 billion over 2025 through 2027. Think about that, $1 billion of free cash flow accumulation from a company that today is currently valued at $3 billion. We are poised to deliver significant shareholder value.

42. Later during the call, Defendant Heaton took over the presentation to discuss, in further detail, the Company's current position and overall resiliency, stating, in pertinent part:

> But first, as a starting point, we've significantly transformed this company over the past few years. At the same time, we've delivered results. You can see here, we've

> grown revenue and EBITDA over the last 4 years, creating almost $90 million of earnings to our base during that time period. And 2024 was a really big year. We completed the divestiture of the Payroll & Professional Services business, and we completed our cloud migration and really the 4-year journey to modernize the platform and everything you heard about earlier today.
>
> I also want to cover the resiliency within this business. It's in the current macro dynamics, it's important to understand we have a predictable growing recurring revenue base. It's tied to long-term contracts, call it, 3 to 5 years in nature, and we're delivering mission-critical work on behalf of the largest, most complex companies throughout the world. And we've got a healthy balance sheet. We delevered [*sic*] last year to below 3x, and we have an improving cash flow profile, which I'll walk you through here today.

43. Defendant Heaton further reiterated and provided additional details surrounding Defendants' fiscal 20205 guidance outlined during the previous February earnings call, as well as detail 2026-27 projections. In pertinent part, Defendant Heaton stated:

> Moving to the outlook for 2025. This is what we laid out last month at earnings. What you should know here is 2025 is a transition year. What you've heard about today is 2023 wasn't perfect. And so we've got a lag effect of some of the items that happened 1.5 years ago, and there's still a lag effect as it comes through into 2025. But we're operating the business very differently today, and we like the trends that we're seeing.
>
> Revenue this year will be flat at the midpoint with recurring revenue up 1%. Within the revenue line, there's a difference as it ramps throughout this year. So the losses that we're seeing this year coming through really starts on January 1, while the new deals that we booked last year, that Greg walked through, begin to go live as we go throughout this year. And so there's going to be an inflection point in our growth into the second half with low to mid-single-digit growth in the second half with continued execution and the momentum that we're seeing today. From a margin perspective, we've done a lot of work already here, and we expect 150 to 180 points of margin expansion and brings us really to about 27% EBITDA margin within this business this year.
>
> The last area I'll cover is free cash flow, and I'll spend more time on this as we go through the deck today. But at the midpoint, 20% growth in free cash flow. We're driving more efficiencies and uses of our cash, and we've simplified our business model. So here are the midterm targets that Dave laid out for you earlier today. Organic revenue growth back to mid-single digits based on continued ARR bookings growth, an improving retention profile and a real opportunity now with our platform and distribution to drive greater partnerships and revenue growth.

As I said, back 27% EBITDA margins this year, on the path to 30% EBITDA margins, much of which is the work has been done, and I'll walk you through the bridge to get to 30%. And then finally, $1 billion, cumulative cash flow over the next 3 years, again, more efficiencies, and I'll walk you through areas like working capital, capital expenditures, some of the areas that are really going to drive free cash flow for this business, $1 billion.

***

I'll talk about project revenue a little bit more, but we've assumed participant counts about 1% within the outlook, and we've assumed project revenue to be flat from what is really a low point that we see this year in 2025. So here's what it looks like just on the bridge. We're at the minus 1.5% to positive 1.5%, so flat today. What you'll see this is also time scaled. You'll see, first, the impacts of the retention coming back to us. And so the improvement there, you start to see first.

Next, you'll see the continued momentum of what bookings and volumes provide. And then I would say you could expect the partners to be on the outside of that from a timing perspective. And I won't need to do the math for this group. You've probably already done it. If you look at the top end of each of these ranges, you can see growth that is outsized of the model. We do expect that there's always going to be mix. The environment can change. There's always going to be a change in timing between the types of deals that we're doing and what we see between wins and losses. But that's really how we think about the growth model for this business.

I did want to capture here for everybody on project revenue. So again, flat is our view in terms of the outlook. You can see really the last 5 years, including this year's outlook in project revenue. This is important work that our teams are doing every day with our clients. We hit a peak of $219 million in 2023. It's always been roughly a little bit less than 10% of the revenues in this business. Off of that peak last year in 2024, project revenue was down 10%, and we're calling it to be down about another 6% at the midpoint this year. So call it, $185 million. We have not seen a pickup in demand. And so we do want to be cautious in terms of the view in terms of the outlook. But history tells us this work comes back.

***

We also have great visibility over the long term in our business. You can see here, we've grown our recurring revenue base by $400 million since 2021. You can see the growth rate on recurring. Just given our focus on the ARR bookings, our recurring revenue base has outgrown the total revenue for the company. Since last year, we've also updated our disclosures, so we report revenue under contract now going out 3 years. So a couple of things I'd point out here. First, in 2026, we already have greater than 2/3 of our revenue under contract. And if you look out to the $1.2 billion in 2027, that longer-term view is up 6% today versus where that same

> longer-term view was last year based on the momentum that we're seeing in the operations of the company.
>
> ***
>
> So let me give you the bridge for EBITDA. So starting where we finished last year at 25% EBITDA margins. The first bucket here is what we've already guided to for the year. So the cloud transformation benefits, the dyssynergies being eliminated, offset with the normalized inflation that we typically get every year is our '25 outlook that brings us to about 27%.
>
> ***
>
> And finally, on capital return, we initiated the quarterly dividend in the fourth quarter of last year. And we've got share buyback authorization of $281 million, which we will be opportunistic on for sure. And so the way to think about it is free cash flow post our TRA is largely going to go towards capital return to our investors.
>
> So let me close where Dave started. Hopefully, you've gathered today the level of focus and execution that's underway by this team. We're leveraging our market leadership position to drive better outcomes for clients and grow those relationships along with new clients leveraging our platform and our capabilities. And by doing that, our growth inflects and we'll create more shareholder value through an earnings and free cash flow profile that grows in excess of the top line.

44. On May 8, 2025, Alight issued its press release reporting first quarter results, in pertinent part, as follows:

> **First Quarter 2025 Highlights** (all comparisons are relative to first quarter 2024)
>
> • Revenue decreased 2.0% to $548 million
> • Gross profit of $171 million and gross profit margin of 31.2%, compared to $182 million and 32.6%, respectively, and adjusted gross profit of $200 million and adjusted gross profit margin of 36.5%, compared to $208 million and 37.2%, respectively
> • Net loss improved to $17 million compared to net loss of $121 million
> • Adjusted EBITDA improved to $118 million compared to $116 million
> • Diluted earnings (loss) per share of $(0.03) compared to $(0.22), and adjusted diluted earnings per share of $0.10 compared to $0.10 per share
> • New wins or expanded relationships with companies including US Foods, Markel and Delek
> • Repurchased $20 million of common stock under existing share repurchase program
> • Declared and paid a $0.04 per share dividend

45. As part of the release, Defendants "reaffirmed" their previous fiscal 2025 outlook. In pertinent part, Defendant Guilmette spoke to their decision to uphold guidance, stating:

> We continue to benefit from a long-cycle recurring business model that has insulated us from short-term market swings as we already have 92% of projected 2025 revenue under contract. While we are not immune to the market impacts, we feel good about the operational levers within our control and have reaffirmed our outlook based on the resilience of our model and visibility today.

46. Alight conducted an earnings call shortly after the release was publicized. During the call, Defendant Heaton discussed the Company's quarterly results and reaffirmed outlook, in pertinent part, as follows:

> Revenue was $548 million and at the midpoint of our guidance range. Recurring revenue comprised nearly 95% of total revenue in the quarter and performed as expected. Nonrecurring project revenues were down $10 million or 26%, in line with our expectations as well. We entered the year fairly cautious on project revenue, and this continues to remain the case in the current market. With our progress in the first quarter, we now have 92% or $2.2 billion of projected 2025 revenue under contract.
>
> Our team is intensely focused on securing the remaining renewals in this cycle and commercial execution across both recurring and project revenue. Adjusted gross profit was $200 million for the quarter. Similar to prior quarters, this is impacted by cost to support the divested business, which are reimbursed for the TSA and other income. This amounted to $10 million in the quarter.
>
> Adjusted EBITDA was $118 million for the quarter at the high end of our guidance range. Free cash flow was $44 million for the quarter, in line with our expectations with timing impacts of tax payments and divestiture-related items. We remain on track towards our annual target of $250 million to $285 million of free cash flow. Finally, we returned $41 million to shareholders this quarter via share buybacks and our quarterly dividend.
>
> ***
>
> Now let me turn to our outlook. We are seeing continued momentum during this renewal cycle. And in addition, while we navigate the current environment, we continue to execute on the day-to-day operations and value-creating initiatives we kicked off last year. As Dave mentioned, while we benefit from a more stable business model, we are watching a few key areas closely given the market

> dynamics, mostly around the demand environment and any longer-term impacts to client participant accounts.
>
> We are reaffirming our outlook for 2025, and this reflects our revenue under contract and operational levers driving enhanced productivity. Our transformation initiatives are on track to deliver a better client experience, streamline processes and drive margin expansion. Today, we disclosed a 15-month restructuring program that supports these activities. Importantly, with all cash investment and benefits already included in our 2025 guide and midterm financial framework from Investor Day.

47. A question-and-answer segment similarly followed Defendants' prepared remarks, during which Defendants discussed positively Alight's 26% decline in project revenue during the following pertinent exchanges:

> **Keybanc Capital Markets Analyst:** Congrats on the moving into expansion. My question really, I want to focus on the project revenue. You guided for continued weakness for this year, but just kind of wanted to give your updated thoughts on the first quarter trends, the comps that you faced in the back half of the year and all the macro noise, obviously, that maybe is a headwind to M&A and whatnot. But just kind of get one of your updated thoughts on the project revenue as we look through the year.
>
> **Defendant Guilmette:** . . . So the first quarter kind of played out as we expected. We didn't go into the year thinking that we're going to see a significant uptick in the project work, as we indicated, and there continues to be softness in the M&A front and some of the things that would typically play out in the first quarter.
>
> What's important now is the second quarter. Our teams are deeply in discussions with our large clients around their plans, strategy for business -- for benefit design, changes for vendor reconfiguration, things of that nature that typically play through in the second half of the year around the enrollment process. So we'll know more clearly over the next several weeks, just how that's shaping up. But all indications are that there's continuous discussion around the importance of those kinds of changes because they really get to the cost of these programs and health care costs continue to inflate and our clients are doing everything they can to try to keep that under control. Jeremy?
>
> **Defendant Heaton:** Yes. What I might add there, Scott, is as we've talked about, the first half project work, which we had expected it to be really in line with where we ended up for the first quarter, tends to be more discretionary projects or ad hoc work that comes in from M&A and the regulatory changes that Dave mentioned. And so I think that was how we thought about the year and coming through and what we're seeing. So the pipeline really builds. I think the June, July timeframe in

> the large enterprise space is where you really get full visibility into what the back half of the year will look like, and as Dave said, tends to be more stable. The comps change a little bit for us. So we expect to see an improving profile there as we get into the back half of the year. But again, we'll get more visibility as we get through the quarter. And these are the teams working with our clients day to day. So we'll get pretty up-to-date information as we progress here.
>
> **Keybanc Capital Markets Analyst:** . . . Dave, I think you mentioned your pipeline is up 30%. Can you provide more color on that? Is that expansion, was that penetrating into the middle markets? Just any more color on the pipeline update.
>
> **Defendant Guilmette:** Yes. Certainly, Scott. So I would say it's kind of across the board. We're seeing nice opportunities in the core admin space. We see a very robust pipeline related to our leave solution and a similar amount of momentum related to our navigation solution. So all in, we feel good about that momentum. We feel good about the strength of the pipeline, and we're going to continue to pursue that those opportunities pretty aggressively here through the second quarter.

48. Defendant Guilmette further rejected the notion of any apparent impact from ongoing macroeconomic noise in the Spring of 2025, pertinently as follows:

> **Needham & Company Analyst:** Great. Nice results. But I just wanted to sort of touch a little bit on the guide and kind of what you guys are seeing in the sales cycle. It sounds like you guys are -- might think that the deal cycles could get extended a bit given the macro. I guess, is that -- is some of that commentary there just being cautious? Or has there been any change in client behavior and decision-making like in the last like month or so, given all the like trade war and uncertainty?
>
> **Defendant Guilmette:** Yes. Kyle, it's Dave. Thanks for your question. We've not really seen any material shift in the buying patterns to date. It's much more about just the overall environment that we're all dealing with. The degree to which there are changes that are happening coming from policy positions with the administration, it just makes our clients stop and think a little bit more about the types of projects that they may undertake or things that might be discretionary. But we've not seen anything that would be taken off the table at this point. And the way that would typically play out is how we put it into 2 categories.
>
> You've got -- the bigger kinds of moves that clients would make introducing on new programs such as the navigation solution, making a change relative to leaves administration or the core benefit administration offerings that we have. Those tend to follow typical cycles when contracts renew, et cetera. And I would say those are all very much underway.
>
> It would be more related to things that might be a little bit more short term, so expansions perhaps where there might be another layer of decision-making or a

> little bit more caution, and that might push a contract being executed out by a couple of weeks, that sort of thing. But we've really not seen anything protracted or anything that would give us a serious concern at this point relative to buying patterns.

49. In a follow-up exchange with the same analyst, Defendant Heaton highlighted the importance of the newly initiated dividend, in pertinent part:

> **Needham & Company Analyst:** Okay. That's really good color. And I guess a follow-up on capital allocation, you guys are thinking about the buyback, in particular, obviously, it seems like we're in just a more volatile market environment in general. But I guess, let's just say, if cash builds this year, would you guys be willing to maybe be a little more tactical or aggressive to try to support the stock if there are dislocations and such?
>
> **Defendant Heaton:** Sure. Thanks, Kyle. Yes, for sure. I mean, I think we talked about it a bit at Investor Day. We've got the -- we had the increase of $200 million. So now we have $261 million of available authorization. And so I think that's important for us and just the flexibility for us on what we want to do and being opportunistic. And so you saw we were active in the first quarter. We'll continue to be. And again, in this type of environment, first, order around capital allocation is to strengthen the balance sheet. And then we're also going to look at opportunities to -- whether it's a strategic partnerships or anything inorganic. But certainly, capital return is there as a priority as well. And so you saw that both with, again, the dividend and being active in share buybacks. So we certainly have the benefit with the authorization available to be very opportunistic this year.

50. The above statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Alight's optimistic reports of growth, cost cutting measures, strong pipeline, and far-reaching visibility fell short of reality; the Company's sales team was not equipped execute in accordance with its management's expectations.

## THE TRUTH BEGINS TO EMERGE

51. On August 5, 2025, Defendants published their second quarter results, with Defendant Guilmette highlighting how Alight's "underlying business operations continued to strengthen during the second quarter." The results were as follows:

> **Second Quarter 2025 Highlights** (all comparisons are relative to second quarter 2024)
>
> • Revenue decreased 1.9% to $528 million
> • Gross profit of $176 million and gross profit margin of 33.3%, compared to $167 million and 31.0%, respectively, and adjusted gross profit of $205 million and adjusted gross profit margin of 38.8%, compared to $196 million and 36.4%, respectively
> • Net loss of $1,073 million compared to net loss of $4 million, primarily driven by the $983 million non-cash goodwill impairment charge related to our Health Solutions reporting unit
> • Adjusted EBITDA improved to $127 million from $105 million
> • Diluted loss per share of $2.03 compared to diluted loss per share of $0.01, and adjusted diluted earnings per share of $0.10 compared to $0.05 per share
> • New wins or expanded relationships with companies including Thermo Fisher Scientific, Highmark Health, Reinsurance Group of America, Incorporated (RGA) and Trinity Industries
> • Repurchased $20 million of common stock under existing share repurchase program
> • Declared and paid a $0.04 per share dividend

52. Despite this positive characterization, Defendant Guilmette highlighted that "deals [are] taking longer to close in the current environment which is temporarily delaying planned growth," resulting in a reduction of Alight's revenue guidance to "Revenue of $2,282 million to $2,329 million."

53. Defendant Guilmette expanded on this issue during the corresponding earnings call, elaborating, in pertinent part, as follows:

> Revenue for the quarter was $528 million and adjusted EBITDA was $127 million, representing an 80 basis point margin increase over the prior year. Free cash flow for the first half was up over 30%. And taken together, these results position us to deliver strong profitability and robust cash flow over the long term.
>
> New deals are taking longer to close through the first half. And in response, we are taking actions to improve our commercial execution. We have updated our revenue

> outlook for 2025 and reaffirm the rest of our guidance, which we'll discuss in more detail during today's call.
>
> ***
>
> The pace of ARR bookings was not at the level we expected coming into the quarter for 2 primary reasons: First, client expansion opportunities are taking longer to close in the current environment; and second, our commercial execution to get deals across the line has not been sufficient. Overall, our solution competitiveness and positioning remained strong but the timing of deals impacts eventual start dates, and in this case, our expected second half 2025 revenue.
>
> To accelerate our commercial execution, we are building more domain expertise with specialty sales experience to balance with our enterprise sales team. We've recently made changes within our commercial organization and have a search underway for new Chief Commercial Officer. The success of the commercial team is a top priority of mine, and I'm pleased with the quality of talent who have expressed interest in Alight and the opportunity to advance our commercial capabilities.
>
> Our ARR pipeline remained strong, particularly for deals in later stages. Opportunities where we are finalists are up 35% versus this time last year, which should increase our conversion rates in the second half sales cycle.
>
> For project revenue, we have not yet seen an uptick in our pipeline. Clients are still assessing their go-forward plan design strategies, while M&A and regulatory work remains at low levels.
>
> So given this backdrop, we are updating our expectations for second half revenue, which Jeremy will cover in more detail. As we doubled down on employee benefit services, we continue to build out a management team with internal and external talent who can extend our competitive advantages.

54. Defendant Heaton provided a bit more color on the Company's quarterly results and the justification for Alight's goodwill impairment charge, in pertinent part, as follows:

> Revenue was $528 million, with recurring revenue comprising over 93% of total revenue in the quarter.
>
> ***
>
> Nonrecurring project revenues were down $9 million or 20%. As a reminder, we entered the year cautious on project revenue, and this remains the case in the current environment.

> Adjusted gross profit was $205 million. Similar to prior quarters, this is impacted by cost to support the divested business, which are reimbursed through the TSA and other income. Normalized for this, adjusted gross profit would be $8 million higher.
>
> Adjusted EBITDA was $127 million for the quarter, and adjusted EBITDA margin expanded 80 basis points as our prior transformational initiatives are delivering favorable results as expected.
>
> Free cash flow for the first half was $102 million, up 31% from the prior year and on track towards our annual target of $250 million to $285 million. While we continue to have strong confidence in the prospects of our health solutions reporting unit, the current market valuation of Alight as compared to the value when going public, combined with the current macro and industry conditions, requires us to take a noncash goodwill impairment charge of $983 million. This value is consistent with the long-term forecast as communicated at our 2025 Investor Day.
>
> Finally, we returned $42 million to shareholders this quarter via our quarterly dividend and through the repurchase of $20 million worth of shares. We ended June with $241 million remaining on our share buyback authorization.

55. Defendant Heaton provided more details as to management's decision to reduce their full year outlook, pertinently, as follows:

> Now let me turn to our outlook. Dave mentioned a number of important clients who renewed long-term contracts with us, including expansions. The momentum during this renewal cycle remains strong. With what we see today, the 2025 renewal cycle is in line with our original guidance and we continue to expect an improved retention rate in 2026. There are, however, factors that have made us more cautious in the second half.
>
> Our initial ARR bookings guidance was for double-digit growth and today, we're expecting bookings that are closer to flat or slightly down year-over-year. This is not where we expected to be, and our in-year revenue resulting from first half bookings will be lower in the second half.
>
> Our pipeline remains strong, and we expect a higher conversion rate as we finish 2025 based on the number of late-stage deals in process as well as changes we have already made within the team.
>
> Moving to project revenue. June and July are typically when we see the project pipeline build and have more transparency into our enrollment work for the remainder of the year. At this point, we are not seeing the second half pipeline build to levels that would drive an inflection in project revenue.

> Clients continue to assess how to move forward with their people strategies as they navigate the current environment, while M&A and regulatory changes remain low. And so we expect third quarter project revenue in line with the second quarter rate, which was down 20%.
>
> Finally, we have not seen growth in participant counts and expect volumes to remain flat this year. We now expect total revenue to be lower by roughly $45 million at the midpoint.
>
> ***
>
> As it relates to other key metrics, we are reaffirming the remainder of our 2025 outlook, which reflects the initiatives we have already completed and operational levers that are independent of top line growth.
>
> ***
>
> In closing, we are intensely focused on execution and improving our top line performance while continuing to drive greater margin expansion and cash flow.

56. During the question-and-answer segment that followed, Defendants discussed at length Alight's financial results and updated guidance, in pertinent part, during the following exchanges:

> **Needham & Company Analyst:** I wanted to start off on the sales cycle. It does sound like things have gotten a little longer and I understand that that's the reason for the drift down in revenue for this year. I wanted to ask a little bit about how those client conversations are going. Do you guys remain confident that you guys are going to be able to still hit on your target specifically for next year? Is it just that maybe these deals take an extra month or 2 here or there and that limits the in-year revenue and next year should be fine? Or is there a potential for like a longer-term or prolonged impact that we should be mindful of?
>
> **Defendant Guilmette:** . . . So I think it's important that we just break down kind of where we think the growth opportunities are going to be. And as I've said it in repeated meetings, we have a lot of opportunity for upsell and cross-sell with our existing client base. That process requires some demand generation as we're talking about problems that need to be solved differently and the solutions that we have that can bring to bear on those problems. And that process and those discussions have been protracted. It's just taking longer to reach those decisions.
>
> So we feel good about the opportunities that sit in the pipeline for that. In fact, in my opening remarks, I said that we're up 35% in deals that are in the final stages. So there's some real timing headwind that we've experienced there through the first

> half of the year. We also, in the new business, new logo pursuit areas, have, in my view, finished second too often, and we have to improve upon our execution there. And there are a number of things that we've done to strengthen that. So we feel good about those changes that have been made as well, and also feel good about the pipeline related to that in the final stages that we're in. So overall, we've made adjustments so that we can be better at commercial execution. And we're going to continue to pursue the opportunities with our existing clients to bring those to close the second half of the year.
>
> To your question around the longer-term view, we've got to execute in the second half. We execute in the second half, we're going to feel good about '26 and feel good about the mid-range.
>
> ***
>
> **UBS Analyst:** So if I do the math right, you beat the first half to the year by about $10 million, and it looks like you cut the second half by $45 million, so it's about $55 million in total. Is that right? Like is the math right there?
>
> **Defendant Heaton:** A bit less than that in terms of midpoint to midpoint is the math that we gave, Kevin, for the update is about $47 million, I think, is the change. So as we said, really, this is a dynamic largely from the in-year revenue that would come from bookings in the first half of the year. So as you think about the bigger portions of the change in revenue, about $35 million of that update is related to inyear revenue. Of that $35 million, I would say about $25 million to $30 million is from ARR bookings and the remainder is from the project side as we did update that midpoint on project, we had about down 6% for the year in the original guide, and then I look at that today is closer to 9% or 10% down for the year. And then there's a balance of -- again, we had a pretty cautious view already around participant counts and what we've call volumes that we brought down to flat. So that's about a $10 million to $12 million update as well for the second half.
>
> **UBS Analyst:** Got it. And then you gave a pretty specific project number for Q3. Can you just give us one for Q4 to try to manage the cadence…
>
> **Defendant Heaton:** Sure. It's likely still negative but closer to flat, Kevin, and that's just built on the enrollment activity that, again, not seeing the inflection that we had hoped for and we're looking at as we watch the pipeline build over the last couple of months, but we don't expect that it will be down at the levels that we would see in the first 3 quarters. Some of that is the comp. Some of that is just the base activity that kind of rolls into the fourth quarter. So again, I think it's probably closer to down single digits, closer to flat.

57. Defendants further fielded several inquiries regarding hiring practices in an effort to improve sales execution, affirming that such efforts were well underway:

**Keybanc Capital Markets Analyst:** . . . And then you mentioned sort of a change around the sales team, and you mentioned more domain expertise as a potential catalyst or a focus. Can you maybe talk about that? And what you saw with these in this current last 90 days that made you more focused on a commercial team with more domain expertise?

**Defendant Guilmette:** Sure, Scott. Thank you for that question. I'm in the market a lot. I'm in front of our clients a lot. I'm in front of our PPEs a lot. There isn't a week that goes by that I'm not in the market. And in many cases, in these pursuits directly with the sales team, in my observation over the last 90 days or so is that some of these sales require real deep domain expertise to be able to bring to life our value proposition. Like these things, we're in every one of these deals, and that's the feedback that we get from our PPEs. But if something doesn't come our way, oftentimes, it's on the margins, it's not like the core positioning of the sales pursuit of the execution. And that's where, in my opinion, we need real strong deep domain expertise. In particular, when you look at some of the specialty opportunities that we're talking about, navigation and leaves. Leaves is a complex space, and you need real expertise to be able to bring that to life.

So I like what we've done in terms of building out our capacity on the enterprise sales front. We've got plenty of capacity, plenty of feet on the street, and we've got lots of good opportunities that are coming through the top of the pipeline, and we like our qualified pipeline. We've got to close more deals. And to close more deals, we need that subject matter expertise at the table.

***

**JPMorgan Chase Analyst:** I wanted to start by asking a follow-up on just a focus on the commercial organization. You mentioned that you have capacity. So given those comments, how should we think about sales force hiring plans and what's embedded in the outlook for the second half and into 2026?

**Defendant Guilmette:** . . . I would characterize the hiring plans is looking for that specialty expertise. We've already brought on a number of individuals in the second quarter to help in that regard. Navigation sales leadership, for example, beefing up what we're doing on the lease side, beefing up what we're doing in terms of how we tell our AI story. We've got a really impactful one that we're proud of. So we're making those changes as well by bringing in certain experts to really help bring that to life. So all of that, I think, has happened already in addition to our looking to bring in a new Chief Commercial Officer. We feel really good about the talent that has identified themselves to want to come here. So I'm confident we're going to have the right person, the right fit in short order. And I think we're going to be fine as we look at the second half of the year going into 2016 from a sales execution capacity standpoint.

58. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the November 14, 2024, February 20, 2025, March 20, 2025, and May 8, 2025, releases and shareholder calls. In those calls and publications, Defendants continually praised the execution potential of its sales team, its scaling ARR growth, and the anticipated uptick in project revenue, while continually minimizing risks associated with project revenue's eroding growth rate, seasonality, and the impacts of the macro environment on Alight's ability to recognize growth.

59. Investors and analysts reacted immediately to Alight's revelation. The price of Alight's common stock declined dramatically. From a closing market price of $5.13 per share on August 4, 2025, Alight's stock price fell to $4.19 per share on August 5, 2025, a decline of about 18.32% in the span of just a single day.

60. A number of well-known analysts who had been following Alight lowered their price targets in response to Alight's disclosures. For example, JP Morgan, while "withdraw[ing] their Dec-25 price target," highlighted management's admitted execution shortcomings: FY25 revenue outlook was lowered by ~2% at the midpoint primarily driven by softer than expected contribution from bookings . . . with management attributing part of the underperformance to macro uncertainty . . . and part to internal execution that needs to improve." Breaking down the quarterly shortfall, the Analyst "commend[ed] management for taking ownership of the bookings shortfall" while "[t]ransformation initiatives in flight supported mgmt.. reiterating its FY25 outlook across profitability metrics."

61. Similarly, UBS highlighted Alight's "mixed Q2 results and a disappointing 2025 top-line cut," as the basis for its price target declining 35%. Pertinently, the Analyst noted the Q2 result alongside the reduced FY25 guidance "provide a reset in expectations." The Analyst went

on to highlight that Alight's "adj. EBITDA margin expanded +80bps YoY due to prior transformational initiatives … [which] helped free cash flow conversion as Alight showcased some capital return with ~$20m buyback ($241m authorized) coupled with ~$22m dividends."

62. The fact that these analysts, and others, discussed Alight's second shortfall and below-expectation guidance revisions suggests the public placed significant weight on Alight's prior sales and growth estimates. The frequent, in-depth discussion of Alight's guidance confirms that Defendants' statements were material.

63. Notwithstanding Defendants' disclosures during the call, they continued to mislead investors by misrepresenting their understanding of the issues surrounding Alight's execution shortfalls and how to combat them. In doing so, the Defendants deceptively claimed confidence in their ability to meet updated projected targets and slow the decline of the Company's project revenue growth rate while keeping hiring costs muted and continuing to give back to shareholders through Alight's dividend.

64. On November 5, 2025, Alight published a release disclosing the Company's third quarter results and further reducing full-year guidance. Defendants posted summarized results as follows:

> **Third Quarter 2025 Highlights** (all comparisons are relative to third quarter 2024)
>
> • Revenue decreased 4.0% to $533 million
> • Gross profit of $178 million and gross profit margin of 33.4%, compared to $174 million and 31.4%, respectively, and adjusted gross profit of $206 million and adjusted gross profit margin of 38.6%, compared to $200 million and 36.0%, respectively
> • Net loss of $1,055 million compared to net loss of $44 million, primarily driven by the $1,338 million non-cash goodwill impairment charge
> • Adjusted EBITDA improved to $138 million from $118 million
> • Diluted loss per share of $2.00 compared to diluted loss per share of $0.08, and adjusted diluted earnings per share of $0.12 compared to $0.09 per share
> • New wins or expanded relationships with companies including MetLife, Cintas and Mass General Brigham

• Repurchased $25 million of common stock under existing share repurchase program
• Declared and paid a $0.04 per share dividend

65. In pertinent part, guidance was reduced to the following outlook:

**Business Outlook**

• Revenue of $2,252 million to $2,282 million
• Adjusted EBITDA of $595 million to $620 million
• Adjusted diluted EPS of $0.54 to $0.58
• Free cash flow of $225 million to $250 million

66. Defendant Guilmette was quoted on the release indicating the company had "seen a favorable step-change in accelerating our client management and delivery capabilities, and reimagining the client and participant experience in line with our long-term strategy."

67. During the corresponding earnings call, Defendant Heaton outlined the Company's below-projection results and the basis for the guidance cut, in pertinent part, as follows:

> Nonrecurring project revenues were down $7 million or 14% for the quarter. Adjusted gross profit was $206 million, up 3% from the prior year, reflecting 260 basis points of margin expansion. Similar to prior quarters, our adjusted gross profit is impacted by costs to support the divested business, which are reimbursed through the TSA and other income. Normalized for this, adjusted gross profit would have been higher by $7 million. Adjusted EBITDA was $138 million for the quarter, up 17% and adjusted EBITDA margin expanded 460 basis points. Free cash flow for the first 9 months was $151 million, up 45% from the prior year period. Given the business trends this year versus expectations, our profitability and cash flow results include a nonrecurring impact of lower variable and performance-based costs.
>
> While we've made tremendous progress, there is more work ahead to improve our top line results. Longer term, we expect improved commercial results with an optimized go-to-market function along with key product enhancements. We feel good about our renewal rates in the large market and expect the 2026 cycle to have over 30% fewer dollars up for renewal. We also have near-term revenue opportunities through in-year bookings, partnerships and engagement services that our team is highly focused on to close out the year. Our operational and technology initiatives continue to drive increased efficiency while delivering a better experience for our clients, and this has benefited our profitability and cash flow metrics.

***

> We returned $47 million to shareholders this quarter via our quarterly dividend and through the repurchase of $25 million worth of shares. Year-to-date, we've repurchased close to 14 million shares or approximately 3% of shares outstanding. We ended September with $216 million remaining on our share buyback authorization. Management and the Board of Directors will continue to evaluate our capital allocation policy as it does on an ongoing basis. With today's earnings report, we have updated our 2025 outlook and enter the quarter with $2.25 billion of revenue under contract.
>
> For the year, we expect revenue between $2.25 billion and $2.28 billion, adjusted EBITDA of $595 million to $620 million, free cash flow of $225 million to $250 million and EPS of $0.54 to $0.58. We are intensely focused on execution and improving our top line performance and remain confident in our position for the long term.

68. Defendants expanded on the reduced projections during the question-and-answer segment of the call, in pertinent part:

> **Needham & Company Analyst:** I wanted to start on the update to the guide, see if you guys could walk us through some of the moving pieces on the reduction here. It looks from the slides, it looks like it's from kind of a combination of volumes and new business wins. But I guess any clarity or context as to what you guys are seeing and when -- at least on the new business wins, obviously, you made some announcements during -- in the release today. But I guess like when should some of the fruits from those wins start to pay dividends?
>
> **Defendant Heaton:** Sure. I'll start, Kyle. So yes, still in the guide, we reduced at the midpoint revenue down $40 million. It's really split between project and recurring. Project is the biggest with, again, a $20 million update there on project. And we just have not seen an inflection in pipeline and activity. I think some continued cautiousness as we're going through the annual enrollment process right now.
>
> So even on a low comp, we had expectations to see more build in the pipeline coming into the fourth quarter and just not seeing that. On the recurring side, it's a bit of volumes. You see in the update in the deck that we've got. Some in that is really -- we've seen modest declines so far year-to-date, but just a sentiment overall, just a cautiousness around that. We're not going to certainly expect with the headlines, see any upside there. So really just expecting flat to slightly down on the volume side. The Strada update on the customer care agreement was impacted in the third quarter, and so that's part of the update as well as going through. And as you said, a small amount of just the in-year revenue from the bookings that we've had so far this year.

***

**Needham & Company Analyst:** Okay. That's helpful. And then maybe just a follow-up. I want to see if you guys are seeing any impact or whether it's client decision-making around open enrollment related to the government shutdown. Obviously, it's been getting kind of long in the tooth here. But I guess, any impact on your business, client decision-making, employee decision-making? Anything you guys are seeing? Or so far, has it been something you guys have been able to work through?

**Defendant Guilmette:** Kyle, it's Dave. Thank you for the question. Let me take that. So as Jeremy mentioned, you've got a few of the headlines that are out there. But in general, whether it's the government shutdown and the impact on federal employees or it's what passes through to clients, we've really not seen anything material come through at this stage. And just keep in mind that even if there is an action, a reduction in force with a big company, there's a pretty big lag factor associated with that.

You'll have individuals who will be on COBRA for a period of time. Sometimes they're furloughed, so they're still sort of there. So -- or in the case of the federal government, you've got people working and not being paid in some circumstances. So longer term, the volume that would typically tick up, we're not anticipating, but we haven't really seen a material negative impact, at least through this quarter, and we're not envisioning that through the fourth quarter.

***

**UBS Analyst:** . . . I mean, you had 2 consecutive meaningful impairments. You've guided down 2 consecutive quarters. Just help us understand just the modeling on the guidance relative to where you're coming in, particularly given we're 9 months into the year because it just continues to be an issue in terms of how you're guiding.

**Defendant Heaton:** Sure. I think the guide, and as I just walked through briefly, I think in the fourth quarter, the biggest piece is the project revenue, which I would say is we've never seen levels this low in terms of project revenue. We did expect and our teams going through with clients every day as we build through kind of the second half of the year in terms of where that pipeline is. It's well below our expectations in terms of project revenue.

So absolutely, that's the biggest piece coming through here. There's also the impacts of what we've talked about in terms of the bookings element that we have and just the macro factors around the headlines around employee and participant counts. So those are the biggest pieces for us in the guide. As you can see in the transcript we talked about this morning, we are at $2.25 billion of revenue under contract coming into the quarter, and the range on the guide is $2.25 billion to $2.28

billion. So I think as you think about this, this is what we see today in terms of what's in front of us for execution in the -- at the end of the quarter.

On the impairment side of it, that's a factor of, again, noncash impairment -- accounting adjustment, largest piece being just the valuation change of the company through the quarter. And that's -- there's a market valuation test, which is done every quarter. It's normal course controls that we have around the financials and need to go through the valuation process. That takes into account the trends that we do see in the business, but it's a much longer-term view taking in the market cap and market value of the company. So we recognized that charge here this quarter in line with where we closed out the quarter from a valuation of the company.

69. Defendants also spoke to the progress of go-to-market initiatives and their sales force hiring assumptions for the remainder of 2025 during the following pertinent exchange:

**JPMorgan Chase Analyst:** I wanted to ask, so last quarter, you spoke to changes within your go-to-market organization, including greater specialization, domain expertise in the sales force. Obviously, these things take time to ramp. But I was curious if you could just provide an update 3 months later about the progress here, how these things have resonated with your sales force.

**Defendant Guilmette:** Sure. So it's Dave. I'll take that one, Andrew. Firstly, bringing Steve Rush back to Alight has been a tremendous boost for us and for our sales team. This is somebody who knows our business really well, has tremendous credibility in the marketplace and is a great team player. So he's collaborating, working through, looking at every deal, et cetera. So that's helpful. We brought some industry expertise on board as well with specialty areas of focus in the leave space, in the navigation solutions and in Core Health admin.

And it's Steve's intent to continue to build out that domain expertise across the sales force. To your point, those changes then have to play their way through on new business situations and opportunities. We're laser-focused on those deals that are deep in the pipeline right now, and we still have a material number of those that we're pursuing. And the key there is to improve our close ratio. And I feel confident that with Steve and the additions that he has already impacted and we've impacted, we should see some uptick on our success with closing on those deals. And then as we enter into 2026, we're going to have the right alignment of our go-to-market teams and our client teams, which I feel really confident is going to give us the opportunity both for upsell, cross-sell and for new logos coming into the company.

**JPMorgan Chase Analyst:** Great. That's good to hear. And just one follow-up for me, more of a macro question. I was curious if there's been any change in the hiring assumption or net hiring assumption you laid out last quarter and the outlook, understanding there's offsets like you called out, Dave, with kind of lagged impact.

> So maybe even just adding on to that question, how material is the hiring assumption within your model or within your outlook considering you have those offsets?
>
> **Defendant Heaton:** I think from -- included in the guide for this year, Andrew, we've got -- and you'll see it in the deck that we posted online. So we've got about down 0.5 point to flat is what we've got in for 2025. And again, year-to-date, it's been really minimal in terms of any impact, I'd say slightly down. But again, you're talking basis points. And so certainly not seeing what we historically have had with the, call it, 1% to 2% of help on the growth side.
>
> So our expectations right now, and we would know typically in the fourth quarter right now as we stand if we had larger impacts that were happening already through our client base. And so that's the call on the guide and based on what we see so far this year. And then as we think about next year, I'd say, yes, it's hard with the headlines to think that it's certainly going to be anything that is additive to growth, but we'll manage that. Our teams stay close with clients on a daily basis. And so we're always getting a pre-read, if you will, around what might be happening within the client bases.

70. On November 24, 2025, Alight issued its press release announcing its second CEO transition in as many years: "the [Board] has appointed Rohit Verma as Chief Executive Officer (CEO) and a member of its Board, effective January 1, 2026. Dave Guilmette will step down as CEO and from the Company's Board on December 31, 2025."

71. While the release made significant efforts to tout his replacement's accomplishments, Alight made little reference to the reasoning behind Defendant Guilmette's departure, adding only the following from the Company's Board:

> I want to thank Dave for leading significant efforts to strengthen Alight's delivery operations, enhance our product innovations, and improve our liquidity and margins … This provides a strong foundation in our work to reimagine the client and participant benefit experiences and return to growth.

72. On December 18, 2025, Alight issued a similar press release, announcing that "Gregg Giometti has been named the Company's Interim Chief Financial Officer, effective January 9, 2026." Reportedly, Defendant Heaton was departing "to pursue an opportunity outside of the benefits administration industry."

73. Defendant Guilmette, rather than any more permanent member of the Company, was quoted on the release, touting the resume of the new Interim CFO and highlighting Defendant Heaton's role in Alight, in pertinent part, as follows:

> Jeremy has made significant contributions during his nearly six years with Alight, helping transition Alight into a public company, while also playing a critical role in transforming the Company into a simpler, more capital efficient organization with a stronger financial foundation. On behalf of Alight, I wish Jeremy much success in his new opportunity and thank him for his service.

74. The above statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's updated projected outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. Conversely, execution concerns were mounting while Alight maintained insufficient investment in its employees in an effort to keep costs down and margins afloat. This ultimately would result in further setbacks to Alight's full-year projections as execution continued to fall short each quarter, alongside the surprising departure of the Company's prominent lead executives, the Individual Defendants in the instant matter, during the course of the fourth quarter.

## THE TRUTH FULLY EMERGES

75. In the morning of February 19, 2026, Alight published its fourth quarter and full year fiscal 2025 results. Notably, the results for both the quarter and the year were well below both street forecasts and Defendants' own prior projections. In pertinent part, Defendants posted results as follows:

> **Fourth Quarter 2025 Highlights** (all comparisons are relative to fourth quarter 2024)
>
> • Revenue decreased 4.0% to $653 million
> • Gross profit of $240 million and gross profit margin of 36.8%, compared to $271 million and 39.9% in the prior year period, respectively, and adjusted gross profit

> of $272 million and adjusted gross profit margin of 41.7%, compared to $300 million and 44.1% in the prior year period, respectively
> • Net loss of $933 million compared to the prior year period net income of $29 million, primarily driven by a $803 million non-cash goodwill impairment charge
> • Adjusted EBITDA of $178 million compared to the prior year period of $217 million
> • Diluted earnings (loss) per share of $(1.78) compared to $0.05 in the prior year period, and adjusted diluted earnings per share of $0.18 compared to $0.24 per share in the prior year period
> • Declared and paid a $0.04 per share dividend
>
> **Full Year 2025 Highlights** (all comparisons are relative to full year 2024)
>
> • Revenue decreased 3.0% to $2,262 million
> • Gross profit of $765 million and gross profit margin of 33.8%, compared to $794 million and 34.0% in the prior year period, respectively, and adjusted gross profit of $883 million and adjusted gross profit margin of 39.0%, compared to $904 million and 38.8% in the prior year period, respectively
> • Net loss of $3,078 million compared to the prior year period net loss of $140 million, primarily driven by the $3,124 million non-cash goodwill impairment charge
> • Adjusted EBITDA of $561 million compared to the prior year period of $556 million
> • Diluted earnings (loss) per share of $(5.83) compared to $(0.25) in the prior year period, and adjusted diluted earnings per share of $0.50 compared to $0.48 per share in the prior year period
> • Repurchased $65 million of common stock under existing share repurchase program

76. The release further disclosed Alight would be halting its dividend which had only commenced the year prior:

> The Company announces it will replace its cash dividend with more efficient capital allocation activities, including deleveraging the balance sheet and, subject to market and other conditions, for share repurchases. The Company believes that these are more effective mechanisms to drive long-term shareholder value creation than dividends at the current price levels.

77. Alight held an earnings call shortly after posting their annual results. During the call, the Company's new CEO, Rohit Verma, highlighted the new management's disappointment with the prior year's results, stating, in pertinent part:

With deep penetration among large and midsized employers, we have a solid foundation from which to expand our relationships and grow market share over time. That said, we have work to do. In 2025, we did not meet our internal financial targets and new bookings and renewals did not meet our expectations, leading us to miss our forecast to the market. During my first 6 weeks at the company, I've connected with more than 35 clients, and it is clear to me that clients want to continue working with us as we play a critical role in helping them manage increasingly complex health, wealth and leaves programs. They're also clear in their requests that we bring simplicity to their participants and management by providing cutting-edge solutions.

Our clients expect flawless service delivery and continued innovation in products that create better outcomes. The attractiveness of our market, our coveted position and the clarity of the asks from our clients enable us to be clear-eyed about our priorities going forward. As a result, our immediate focus is driving service and operational excellence across our unmatched portfolio of benefit solutions, innovating products enabled by AI to create a cutting-edge user experience, real value and actionable insights for clients and participants, while building relationships that result in enduring trusted partnerships with clients, participants and partners. These priorities are all things within our control, which give me great confidence in our ability to improve as does some of our recent progress.

***

Before I turn the call over to Greg, I want to provide some details on our 2025 financial performance. We generated $2.3 billion in revenue with adjusted EBITDA of $561 million and an adjusted EBITDA margin of approximately 25%. With that said, I would reiterate that we believe there is significant opportunity to improve our performance moving forward. Our adjusted EBITDA in the fourth quarter was impacted by an increase in compensation expense driven by our commitment to invest in the business with a focus on promoting service quality, strengthening relationships and positioning the business for growth. Importantly, the business generated $250 million of free cash flow in 2025, which enabled us to maintain a strong liquidity position and positions us well as we head into 2026.

***

I am confident that we are at the forefront of implementing the right strategy to return the business to long-term growth, but this will take some time. Given that we missed guidance targets several times in 2025, I don't think it's prudent for me to provide full year guidance when I'm just 30 working days into my role. What I can say is that we expect first quarter 2026 revenue to be down by high single-digit percentage range. Likewise, we anticipate that our planned investments in sales, account management and user experience will create short-term adjusted EBITDA margin pressure, resulting in a decline of 500 to 750 basis points as compared to last year's first quarter. We view these investments as critical to executing on our

> stated priorities and meeting the expectations of our stakeholders. While our business has faced challenges, the attractive market dynamics, our strong leadership position and clear direction from our clients gives us a very achievable road map for driving margin expansion and growth in the midterm.

78. Alight's newly appointed Interim CFO, Gregory Giometti, then took over the call to detail the financial figures underlying Alight's earnings shortfall, pertinently providing the following:

> Turning to our fourth quarter results. We continue to think about revenue mix across 2 categories: recurring renewable business and nonrecurring project-based work. Revenue for the fourth quarter was $653 million. Recurring revenue of $607 million was down 1.6% compared with the prior year period. Project revenue of $46 million was down 27%. Fourth quarter adjusted gross profit was $272 million, down 9.3% from the prior year period, reflecting an adjusted gross profit margin decline of 240 basis points. Adjusted EBITDA for the fourth quarter was $178 million as compared to $217 million in the prior year period. Fourth quarter 2025 adjusted EBITDA margin was 27.3% compared to 31.9% in the prior year period.
>
> Adjusted EBITDA during the fourth quarter of 2025 was adversely impacted by increased compensation expense, which we believe is critical to executing on our priorities. This impacted adjusted EBITDA by approximately $45 million. Excluding this, adjusted EBITDA would have been within our previously communicated guidance range. Adjusted net income in the fourth quarter was $96 million with adjusted EPS of $0.18 compared to $127 million of adjusted net income and adjusted EPS of $0.24 in the fourth quarter of 2024.
>
> Looking at the full year, total revenue was approximately $2.3 billion. Recurring revenue of approximately $2.1 billion was down 2.2% compared to the prior year period. Project revenue of $154 million was down 22%. Adjusted gross profit for the full year was $883 million compared to adjusted gross profit of $942 million in 2024. Full year adjusted gross profit margin decreased 100 basis points compared to 2024. Full year adjusted EBITDA was $561 million with adjusted EBITDA margin of 24.8% compared to adjusted EBITDA of $594 million with adjusted EBITDA margin of 25.2% in 2024. Adjusted net income for the full year was $266 million with adjusted EPS of $0.50 compared to $313 million of adjusted net income and adjusted EPS of $0.57 in 2024. In the fourth quarter of 2025, we recognized a noncash goodwill impairment charge of $803 million. We have remaining goodwill of $83 million on the balance sheet.

79. During the question-and-answer segment, the new management further clarified some of the shortcomings of their predecessor's actions in pertinent part as follows:

**Citigroup Analyst:** So the messaging on the scale, the partner ecosystem, the mission-critical platform capability, this has been quite consistent with the prior execution teams here. But there's been a real gap between this sentiment in the asset value of the company and the core financial performance. It has been regular misses on client retention, pipeline conversion and any stability to growth. Recognize that you've been in the role for 30 days, but I was just -- I had 3 questions. I'm just curious, what's your take on what are -- what have been some of the drivers in some of the financial underperformance in recent periods?

Second question, your experience previously CEO at Crawford, what do you bring to the table in terms of being able to turn around the company? Just curious on that perspective. And then final, I understand this is yet another transition year for the company. How should we think about measuring any milestones in the next 12 months?

**Rohit Verma:** I appreciate it. Thank you, Peter. Great set of questions. So let me start from the top, right? What do I think are the drivers for the financial underperformance First and foremost, I had a hypothesis when I was coming into the organization. And that hypothesis was, as you stated, right, we're in a great industry. We've been here for a long time. Our brand is well recognized. We've got an enviable client base. And we have a service that if we execute well, it should be sticky. 30 days in, I have only strengthened that conviction, right, which is that those things are absolutely correct. Obviously, while coming in, I also knew that financially, we had not performed to the expectations of the organization as well as that of the Street and that also I have seen. I would say the biggest challenge for us has been on driving operational excellence, which to me is an execution piece, right? So this is not a change in the strategic direction of the company.

This is a change in the execution of the company. So the biggest piece that we need to tighten is around execution. It's execution around operational excellence. It's execution around client management and relationship management, it's execution around technology and it's execution around continuing to innovate our products and services. So that, to me, are the 3 biggest pieces, right, that we have to push on. That leads me into my experience as the CEO at Crawford. When I joined Crawford, right, we had not grown for 10 years.

***

**D.A. Davidson Analyst:** Rohit, congrats on the new role. I think it's good to have you as the firm and look forward to working with you. I think the termination of the dividend program right after that was the right decision. And as we look into some of the initiatives here that we've just talked about, the additional comp in the fourth quarter of '25 and then the $100 million of incremental investment spend in certain areas, I guess, what portion of both of those do you view as recurring versus onetime? And in terms of the $100 million recurring, would you expect that to be front-end loaded in 2026?

> **Rohit Verma:** Great question, Peter. Thank you so much, and I look forward to meeting you as well. Peter, the way I would think about it is that the $100 million is not an additional investment. It is the CapEx that we have planned for this year. It's the capital investment we've planned for this year. Do I expect it to repeat it? I expect some part of it to repeat, right, because a lot of these things that we're trying to do aren't going to be done in 1 year. But as I had answered to Peter from Citi before that this has been an execution journey for us or this will be an execution journey for us and a large part of that depends on us doing -- bringing about changes in our processes, bringing about changes in our systems and modernizing those things to really meet the needs and asks of our clients.
>
> As far as the nature of the compensation, I do expect that to be recurring. And the reason I say that is because we are adding more horsepower from a sales management perspective. I want to make sure that individuals are incentivized for driving execution. And because I want execution to be the way we do business, I expect that part of the expense to be recurring.

80. The aforementioned press releases and statements made by Alight's new management contradicted the Individual Defendants' earlier statements, including those made during the August 5 and November 5, 2025, earnings calls. During those calls, the Defendants portrayed an understanding of the issues surrounding their revenue slowdown and seemed confident in being able to turn around the execution shortcomings they highlighted. Defendants' reduced guidance allegedly factored in continued risks and plans to implement improvements to the execution of Alight's sales force. Defendants' comments surrounding their next steps toward such improvement made no suggestion that the dividend, initially issued to highlight management's "commitment … to consistently return capital," would need to be omitted to facilitate Defendants' projections.

81. Investors and analysts again reacted promptly to Alight's revelations. The price of Alight's common stock declined dramatically. From a closing market price of $1.31 per share on February 18, 2026, Alight's stock price fell to $0.81 per share on February 19, 2026, a decline of nearly 38% in the span of one day.

82. A number of well-known analysts who had been following Alight lowered their price targets in response to Alight's disclosures. For example, DA Davidson, which cut its price target 40%, highlighted the revenue and earnings shortfall, with margins "pressured in the period by lower overall revenue as well has higher compensation expense." Detailing the results, the Analyst's report highlighted that "Project revenue as the primary drag to total revenue in the 4Q, falling 27% Y/Y"; notably, "project revenue fell 10% Y/Y to $197M" in 2024, followed by "an additional 22% Y/Y to $154M in 2025." The Analyst also highlighted that the "Board terminated the company's quarterly dividend program," fell short of providing any guidance for Fiscal 2026, and "recognized a non-cash goodwill impairment charge of $0.8B," bringing the total annual impairment to $3.1B in 2025.

83. Citi had some harsher words for the Company's challenges, calling it "the classic definition of a value trap." The Analyst highlighted that the Company's "fourth CEO since 2018 has only started assessing 'execution' driven challenges" and notes that Citi "no longer see[s] a pathway for the stock to return to previous levels soon. The Analyst went on to highlight that "Project revenue decline 27% YoY," noted the EBITDA and EPS shortfalls, and acknowledged that Alight was "eliminating the regular dividend." Citi's Analyst resultantly slashed their price target for Alight by more than 90% to only $1.00.

84. The fact that these analysts, and others, discussed Alight's revenue and earnings shortfall, sudden CEO and CFO transitions, elimination of the recently instituted dividend, and overall execution missteps and challenges suggests the public placed significant weight on Alight's statements of prior confidence in their new growth plans. The frequent, in-depth discussion of Alight's repeated shortfalls and missed guidance confirms that Defendants' statements were material.

## SHARE REPURCHASES

85. In violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, the Individual Defendants issued, and caused the Company to issue, the statements referenced above in the Company's Forms 10-K and earnings calls. These statements, for the reasons set forth above, were materially false or misleading when made. The Individual Defendants' misrepresentations artificially inflated and/or maintained the price of Alight's shares, causing the Company to purchase shares at artificially high prices through its significant stock repurchase program.

86. The Individual Defendants' conduct caused Alight to make share repurchases, signaling to investors and stockholders their purported belief that Alight shares were trading at a discount, which caused investors to purchase shares and thus, drive the price up. Relatedly, the Company's repurchase of shares artificially inflated its financial metrics such as earnings per share ("EPS") as the repurchases resulted in fewer outstanding shares. Together, these actions helped further inflate and/or maintain at artificial levels Alight's share price. The artificial inflation of Alight shares was financially beneficial to the Individual Defendants, as the misrepresentations increased the value of stock and options they held; benefited those Officer Defendants whose compensation was tied to the Company's financial performance.

87. In total, the Individual Defendants caused the Company to spend an aggregate amount of approximately $77.1 million to repurchase approximately 15.5 million shares of its own common stock at artificially inflated prices, from December 2024 through September 2025. The share repurchases were made pursuant to the Company's stock repurchase program which was authorized by the Company's Board on August 1, 2022 and increased in March 2024 and February 2025 as follows:

| Date | Shares Repurchased | Average Repurchase Price ($) | Total Cost of Repurchases ($) | Total Overpayment ($)[1] |
|---|---|---|---|---|
| December 2024 | 1,629,811 | 7.36 | 11,995,408.96 | 10,675,262.05 |
| March 2025 | 3,245,932 | 6.17 | 20,027,400.44 | 17,398,195.52 |
| April 2025 | 4,055,349 | 4.94 | 20,033,424.06 | 16,748,591.37 |
| August 2025 | 4,705,771 | 3.84 | 18,070,160.64 | 14,258,486.13 |
| September 2025 | 1,874,365 | 3.75 | 7,028,868.75 | 5,510,633.10 |
| **TOTAL** | **15,511,228** | **--** | **77,155,263** | **64,591,168** |

88. When the truth emerged, the Company's share price fell to $0.81 per share – the price it should have been at all times had it not been artificially inflated by the wrongful conduct alleged herein. Accordingly, the repurchases should have cost the Company only approximately $12.5 million.

89. Despite this, while issuing false and misleading statements to the market, failing to exercise its oversight responsibilities, and causing the artificial inflation of the Company's share price, the Individual Defendants caused the Company to repurchase over 15.5 million shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by at least ***$64.5 million.***

90. These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

### Securities Class Action

1 "Total Overpayment" refers to how much the Company overpaid for its own stock and is calculated by subtracting what the Company should have paid for its stock at its true value ($0.81) from the total amount the Company actually paid for its stock.

91. On March 16, 2026, a securities class action complaint was filed in the United States District Court for the Northern District of Illinois against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *McCarty v. Alight Inc., et al.*, Case No. 26-cv-2924 (N.D. Ill.) ("Securities Class Action").

92. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Share Repurchases**

93. As discussed above, while in possession of material non-public information, the Individual Defendants permitted and/or caused the Company to repurchase its own common stock at artificially inflated amounts. In total, the Company overpaid for its own common stock by approximately $64.5 million.

**Unjust Compensation**

94. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

95. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed

to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

96. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

97. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

98. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

99. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

100. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

101. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations

as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**<u>Code of Conduct</u>**

102. At all relevant times, the Company had in place its Code of Conduct which applies to all "Officers and Directors" of the Company.

103. From the outset, the Code of Conduct provides:

> When engaged in business activity related to Alight, colleagues and partners are required to follow the rules and guidance in this Code and colleagues must certify annually that they have reviewed and understand the Code requirements.
>
> Given that many provisions of this Code and Alight's policies are based on legal requirements, violations can subject individuals or Alight to fines, penalties and even criminal or civil sanctions. Those violations may also severely damage Alight's reputation.

104. In a section entitled "Accuracy and retention of business records," the Code of Conduct states:

> Compliance with records management practices supports efficient business operations, preservation of corporate memory, and compliance with relevant legal and regulatory requirements. The Alight Global Records Management Policy establishes Alight's rules regarding records management processes across Alight. This includes the creation, storage, access, use, and secure disposal of corporate information, including, but not limited to, business records.
>
> All colleagues are responsible for ensuring that business records are properly identified, retained, protected and disposed of in accordance with legal requirements and Alight's Global Records Management Policy and associated standards.
>
> Our ask of you
>
> 1. Retain and protect business records for the applicable record-retention period.
>
> 2. Preserve and protect business records as directed by the Legal Department in connection with a litigation or investigation.

> 3. Properly and promptly dispose of business records for which retention is no longer necessary for legal or business reasons and not otherwise required under Alight policy.

**<u>Audit Committee Charter</u>**

105. At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee. Specifically, the Audit Committee Charter provides that its primary purpose is to:

> assist the Company's Board of Directors (the "Board") in fulfilling its responsibilities to oversee:
>
> • The quality and integrity of the Company's financial statements, as well as oversight of its accounting and financial reporting processes;
>
> • The effectiveness of the Company's control environment, including internal controls over financial reporting;
>
> • The Company's compliance with legal and regulatory requirements, including those applicable to financial statements and accounting and financial reporting processes, as well as compliance with ethical standards adopted by the Company;
>
> • The effectiveness of the Company's risk management processes;
>
> • The qualifications, independence and performance of the Company's independent auditor and internal audit function, as well as oversight of its financial statement audits; and
>
> • The Company's technology security and data privacy programs.
>
> In addition, the Audit Committee shall be responsible for preparing the "Audit Committee Report" required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

106. The Audit Committee Charter also sets forth the following specific duties and responsibilities:

> **A. Review of Documents and Reports and Accounting and Financial Reporting Process:**
>
> ***1. Financial Statements & Disclosures***. The Audit Committee will review and discuss with management and the independent auditor the Company's quarterly and

annual consolidated financial statements and related footnotes, including the completeness and clarity of the disclosures in the financial statements and Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations (including any disclosures made by the Chief Executive Officer and Chief Financial Officer as part of their quarterly certification process under Section 302 of the Sarbanes-Oxley Act). This review will occur prior to the Company filing its Quarterly Report on Form 10-Q and its Annual Report on Form 10-K.

***2. Financial Reporting Processes***. In consultation with the independent auditors and the internal auditors the Audit Committee will review the integrity of the Company's financial reporting processes.

In that regard, the Committee must obtain, review and discuss with management and the independent auditor reports from management and the independent auditor regarding:

• the critical accounting policies and the significant judgments and estimates used by the Company in the preparation of the financial statements; major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection and application of accounting policies;

• any alternative accounting treatments or non-GAAP measures included in the financial statements and the MD&A, including analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent auditor;

• major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

• any other material written communications between the independent auditor and the management, such as any management letter or schedule of unadjusted differences.

As part of this review and discussion, the Committee will consider the results of the quarterly review (and annual financial statement audit) performed by the independent auditor, as well as the results of internal audit activities related to the Company's accounting and financial reporting processes and controls.

***3. Press Releases & Other Financial Information***. The Audit Committee shall review and discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "pro forma" or

"adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Audit Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance. Furthermore, in addition to reviewing Forms 10-Q and 10-K, the Audit Committee will review other SEC filings/communications, as needed.

***

***8. Review of Internal Controls***. The Audit Committee shall review and discuss the Company's process for assessing the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act, which includes reviewing any significant deficiencies or material weaknesses identified and associated remediation plans. Furthermore, the Audit Committee will review and discuss with management and the independent auditor any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

**B. Oversight of Regulatory and Ethics Compliance Matters; Code of Conduct**

***1. Code of Conduct***. The Audit Committee will have general oversight responsibility for the Company's regulatory and ethics compliance policies and programs, including the Company's Code of Conduct (the "Code"). In this regard, the Committee will oversee, review and periodically update the Code, review any significant violations of the Code, review requests of waivers of the Code by executive officers and directors, as well as the Company's system to monitor compliance with and enforce the Code.

***2. Whistleblower Policy***. In addition, the Committee will establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

***3. Securities Trading Policy***. The Committee will periodically review, oversee, monitor compliance with and amend (or recommend amendments to the Board), as needed, the Company's Securities Trading Policy, and report to the Board as needed.

***4. Legal and Regulatory Matters***. The Committee will also review any significant findings noted by external regulatory agencies, as well as periodically review and discuss with the Company's General Counsel any legal matters that have been

brought to the Committee's attention and that may have a significant impact on the Company's financial statements.

**C. Risk Management Process**

The Audit Committee will periodically discuss the Company's operational and financial risk exposures (including the risk of fraud) and the steps management has taken to monitor and control such exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. Additionally, the Audit Committee will review the Company's network security program and controls with the Company's Chief Technology Officer and evaluate the adequacy of the Company's data privacy compliance program with the General Counsel, including the potential impact of data privacy risk exposures on the Company's business, financial results, operations and reputation, the steps management has taken to monitor and mitigate such exposures, the Company's information governance policies and programs and major legislative and regulatory developments that could materially impact the Company's data privacy risk exposure.

**<u>DUTIES OF THE DIRECTOR DEFENDANTS</u>**

107. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

108. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

109. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

110. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

111. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

112. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

113. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114. Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

115. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

116. Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during the times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

117. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

118. At the time this suit was filed, the Company's Board was comprised of eleven (11) members, consisting of the Director Defendants, except Defendant Guilmette. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

## THE CURRENT DIRECTORS ARE NOT INDEPENDENT OR DISINTERESTED

### The Director Defendants Each Face a Substantial Likelihood of Liability

119. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions

concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

120. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

121. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

122. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

123. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in

the scheme, and consciously disregarded their duties to protect corporate assets.

124. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

125. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

126. Moreover, each of the Director Defendants permitted and/or caused the Company to engage in harmful share repurchases, causing over $64.5 million worth of damage. Specifically, the Director Defendants authorized the harmful share repurchase program in August 2022 and its increases in 2024 and 2025, as discussed above. In addition, the Director Defendants authorized the repurchases, or took positive steps to make the repurchases, thus causing harm to the Company. Because the Director Defendants each face liability for their violations of Section 10(b) of the Exchange Act, none of them can independently consider a demand to sue.

127. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

128. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Verma**

129. Defendant Verma is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Verma cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

130. As CEO, Defendant Verma also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Verma could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Verma is therefore futile.

131. In addition, Defendant Verma receives lucrative compensation in connection with their employment with the Company. Defendant Verma is not independent from the directors serving on the Compensation Committee as they are responsible for evaluating and determining the compensation of the Executive Officers. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Verma could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

132. Because of Defendant Verma's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Verma is unable to comply with his fiduciary duties and prosecute this action.

**Defendants Fradin, Foley, and Massey**

133. In connection with the closing of the Company's Business Combination, on July 2, 2021, the Company, Trasimene Capital FT, LP, Bilcar, Cannae LLC and THL FTAC LLC (collectively with Trasimene Capital FT, LP, Bilcar and Cannae LLC, and together with their affiliated transferees, the "Sponsor Investors"), and certain other investors entered into an Investor Rights Agreement (the "Investor Rights Agreement").

134. The Investor Rights Agreement provides that the Sponsor Investors have the right to designate and have designated three of the eleven directors on the Company's Board, including the Chairperson. In connection with this, Defendants Fradin, Foley, and Massey were each appointed to the Board, and Fradin serves as Chair.

135. As the Company thus admits, the Sponsor Investors may be considered to have significant influence with respect to the Company's management, business plans and policies, including the appointment and removal of the Company's officers.

136. As a result, demand is excused as to Defendants Fradin, Foley, and Massey because the Sponsor Investors that control their appointment to the Board have significant influence and control over the Company. Thus, the Sponsor Investors—and Fradin, Foley, and Massey by connection—cannot be considered independent.

137. Further, none of the other Director Defendants could plausibly consider a demand to sue Fradin, Foley, and Massey because they are backed by the Sponsor Investors, who have significant influence over the Company. Thus, a Director Defendant that considers a demand to sue could jeopardize their continued service on the Board.

**Defendants Hayes, Lopes, Mangini, Schriesheim, and Williams**

138. Defendants Hayes, Lopes, Mangini, Schriesheim, and Williams served as members

of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

139. Defendants Hayes, Lopes, Mangini, Schriesheim, and Williams breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Hayes, Lopes, Mangini, Schriesheim, and Williams face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

140. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

141. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of

integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

142. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

143. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

144. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

145. Publicly traded companies, such as Alight, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an “insured vs. insured” disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company’s damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

146. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

147. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

148. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

149. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

150. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent

the Company's publicly reported information. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

## (Against the Individual Defendants for Gross Mismanagement)

153. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

154. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

155. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

156. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

157. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

159. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

160. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

161. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

163. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to

the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

164. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)**

165. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

166. The Individual Defendants disseminated and/or approved public statements that failed to disclose the above-referenced truthful facts and, as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused the Company to repurchase millions of shares of Company stock, thereby causing significant financial harm to the Company.

167. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Alight, their control over, and/or receipt and/or modification of Alight's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Alight, participated in the fraudulent scheme alleged herein.

168. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

169. The Individual Defendants were each members of Alight's Board and senior management team during the aforesaid time period. Based on their roles at Alight, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

170. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Alight, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

171. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial

statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

172. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of their breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 20, 2026

Respectfully submitted,

/s/ *Carl V. Malmstrom* .
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***